Filed 6/26/13  P. v. Woods CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT WAYNE WOODS,<br><br>    Defendant and Appellant. | C068496<br><br>(Super. Ct. Nos. CM033079,<br>CM033637) |

This appeal involves two criminal cases against defendant Robert Wayne Woods. In CM033637, defendant stole a bottle of rum from a Safeway store in Chico.  He was convicted by jury of one count of petty theft.  Prior to the jury's verdict in this case, solely for purposes of making the offense a felony, defendant admitted to having three prior theft-related convictions resulting in imprisonment.  (Pen. Code, § 666.)[1] Defendant also admitted one prior prison term enhancement allegation.  (§ 667.5, subd. (b).)  In CM033079, defendant violently beat and threatened his girlfriend, Victoria Lemilliere.  He was convicted by a separate jury of one count of inflicting corporal injury

---

[1] Undesignated statutory references are to the Penal Code.

1

on a cohabitant (§ 273.5, subd. (a)), one count of assault (§ 240), and one count of making a criminal threat (§ 422). During the trial in this case, defendant admitted three prior prison term enhancement allegations, based on the same three theft-related convictions admitted in CM033637. (§ 667.5, subd. (b).)

Sentencing in the two cases was combined. Defendant was sentenced to an aggregate term of seven years, four months in state prison (upper-term sentence of four years) for inflicting corporal injury on Lemilliere, plus a consecutive eight-month sentence (one-third the middle term) for making a criminal threat, plus a consecutive eight-month sentence (one-third the middle term) for petty theft with priors, plus two consecutive one-year sentences for prior prison term enhancements. A six-month sentence was imposed for assault and ordered to be served concurrently.

On appeal, defendant contends: (1) the trial court violated his constitutional right to due process by failing to conduct a "meaningful" competency hearing after defendant's trial counsel expressed a doubt concerning his mental competence under section 1368; (2) the trial court prejudicially erred and violated his right to due process by failing to instruct the jury sua sponte that defendant's voluntary intoxication could be considered in determining whether he possessed the specific intent required to make a criminal threat within the meaning of section 422; (3) defendant's trial counsel rendered constitutionally deficient assistance by failing to request an instruction on voluntary intoxication; (4) the trial court further violated defendant's right to due process by declining to grant a mistrial after the prosecution mistakenly played a portion of a jailhouse phone call the trial court had ordered redacted; and (5) the trial court should have stayed execution of the sentences imposed on defendant's convictions for making a criminal threat and assault pursuant to section 654.

As we explain, we agree the trial court should have "appoint[ed] two psychiatrists, licensed psychologists, or a combination thereof," to examine defendant because he informed the trial court he did not want to be found to be mentally incompetent. (§ 1369,

2

subd. (a).) However, defendant was not prejudiced by the trial court's failure to do so. "The appointment of two experts in such circumstances provides a minimum protection for the defendant against being incorrectly found incompetent to stand trial." (*People v. Harris* (1993) 14 Cal.App.4th 984, 996.) Here, after defendant refused to cooperate with the psychologist who was initially appointed to examine him, the trial court asked defendant whether he wanted another doctor appointed. Defendant responded: "No. I'm fully aware of what's going on." Defense counsel (who was filling in for the attorney who had expressed a doubt concerning defendant's mental competence) then conferred with defendant and confirmed: "He has indicated again he's not going to talk with the doctor, and it doesn't matter which doctor you appoint, your Honor." Counsel also stated on the record he would be "hard-pressed" to express a doubt about defendant's mental competence, explaining: "He seems to understand his case. He wants to talk with me about his case, to go over discovery with me and to cooperate in his defense. He wants to go to jury trial as soon as possible." The trial court ruled that defendant had not carried his burden of establishing his incompetence to stand trial and reinstated the criminal proceedings. Thus, defendant was not incorrectly found incompetent to stand trial. Nor did the trial court violate defendant's right to due process by declaring him competent to stand trial based on the psychologist's letter reciting defendant's refusal to cooperate, defense counsel's statements concerning his interactions with defendant, the trial court's own observations of defendant, and the presumption of mental competence found in section 1369, subdivision (f). (See *People v. Maxwell* (1981) 115 Cal.App.3d 807, 812.)

Turning to defendant's remaining contentions, we conclude the trial court had no sua sponte duty to instruct the jury on voluntary intoxication. Nor was defendant prejudiced by his trial counsel's failure to request such an instruction. The trial court properly declined to declare a mistrial after the prosecution mistakenly played a portion of the jailhouse phone call that should have been redacted. And the trial court was not

required to stay execution of the sentences imposed on his convictions for making a criminal threat and assault.

However, we do find an error in the judgment. As mentioned, defendant admitted *one* prior prison term enhancement allegation in CM033637 and admitted *three* such allegations in CM033079. However, the trial court imposed the mandatory one-year sentence for *two* of these enhancements. Having received supplemental briefing on this issue, we conclude the trial court failed to advise defendant of his *Boykin-Tahl*[2] rights prior to accepting his admissions in CM033079. We cannot infer that defendant voluntarily and intelligently admitted these enhancement allegations. Accordingly, we reverse the two prior prison term findings not supported by a valid admission, vacate defendant's sentence, and remand the matter to the trial court for retrial of these enhancements and resentencing.

In all other respects, we affirm the judgment.

FACTS

### Case No. CM033637

On April 29, 2010, defendant walked into a Safeway store in Chico, entered the liquor aisle, grabbed a bottle of Seagram's rum, and quickly walked out of the aisle. A loss prevention employee who was in the liquor aisle followed defendant to an adjacent aisle and watched him place the bottle of rum in his waistband underneath his hooded sweatshirt. Defendant then walked out of the store without paying for the rum. The employee followed, identified himself as "Safeway Loss Prevention," and asked defendant to hand over the merchandise. At first, defendant denied taking anything from the store. But when the employee told him to return the bottle of rum that was in his waistband, defendant complied and apologized.

---

[2] *Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274] (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

4

On July 29, 2010, defendant and Lemilliere spent the day at the river with their three grandchildren. When they returned to their apartment, Lemilliere and the children took a nap. Defendant and a friend hung out on the porch drinking Four Loko, a caffeinated malt beverage with 12 percent alcohol content. When Lemilliere woke up, she could tell defendant was intoxicated and asked him to send his friend home so he could spend time with his grandchildren. Defendant ignored her. She then decided to walk the children back to their parents' house, a short distance away. The youngest child, who was almost two years old, was placed in a double stroller at the bottom of the stairs leading to the apartment. The other children, who were four and seven years old, waited with the stroller at the bottom of the stairs while their grandmother placed their belongings in a diaper bag upstairs.

When defendant saw that Lemilliere was getting ready to take the children home, he became angry and said it was "his job to take the kids home." Lemilliere argued with defendant because he was "too intoxicated" to do so safely. The argument turned into a swearing match, which quickly turned violent. After calling Lemilliere "a bitch, a cunt, a whore, and a slut," defendant "punched her multiple times in the face." Lemilliere fell to the ground. Defendant then "grabbed her by the hair and struck her head against the wall two times." At this point, defendant said: "Oh, my god." Lemilliere responded: "See what you did to me?" Defendant then struck her head against a stereo speaker that was on the ground. Lemilliere "felt like she was going unconscious." Defendant then grabbed a pillow from the ground and "forced it over her face," saying: "Die, bitch, die." Afraid she was going to die, Lemilliere pretended to be unconscious and turned her head to the side so she could "slightly breathe." Finally, defendant "stood above her and stomped on her face." Lemilliere continued to feign unconsciousness.

When defendant left the room, Lemilliere got up and ran down the stairs. She then loaded the middle child into the stroller and walked the children home. By the time

Lemilliere reached her daughter's house, she realized she had blood coming from her nose and mouth. She also had multiple bruises and "a shoe print on [her] face." After dropping the children off, Lemilliere slowly made her way back to the apartment, stopping outside her daughter's house to smoke a cigarette because she was "upset" and "shaking." She also stopped at some railroad tracks and "hung out for a little bit," hoping defendant would be "passed out" by the time she got home. When Lemilliere reached the apartment, she stopped in an adjacent alley and watched through a fence as defendant "was yelling and screaming and throwing things off the porch." Eventually, defendant passed out on a mattress in the living room. Police arrived a short time later. Apparently, one of the neighbors reported the disturbance. When Lemilliere explained to the responding officers what had happened, she "was shaking" and "very fearful." Based on Lemilliere's injuries and account of events, police entered the apartment and took defendant into custody.

DISCUSSION

I

*Competence to Stand Trial*

Defendant contends the trial court violated his constitutional right to due process by failing to conduct a "meaningful" competency hearing after defendant's trial counsel expressed a doubt concerning his mental competence under section 1368. We disagree.

**A.**

*Legal Principles*

"It is well established that the criminal trial of an incompetent defendant violates the due process clause of the state and federal Constitutions." (*In re Ricky S.* (2008) 166 Cal.App.4th 232, 234; *Medina v. California* (1992) 505 U.S. 437, 453 [120 L.Ed.2d 353, 368]; *Pate v. Robinson* (1966) 383 U.S. 375, 377-378 [15 L.Ed.2d 815, 817-818]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1002.) The standard for determining whether a defendant is competent to stand trial was set forth in *Dusky v. United States* (1960) 362

U.S. 402 [4 L.Ed.2d 824]. "Under that standard, the inquiry is whether the defendant '"has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding -- and whether he [or she] has a rational as well as factual understanding of the proceedings against him [or her]."'" (*Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 857, quoting *Dusky v. United States*, *supra*, 362 U.S. at p. 402 [4 L.Ed.2d at p. 824].)

These constitutional protections are also implemented by statute. (§ 1367 et seq.) Section 1367, subdivision (a), provides that "[a] criminal defendant is incompetent and may not be 'tried or adjudged to punishment' if 'as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.'" (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1273.)

Section 1368 provides in relevant part that if, "during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent" (§ 1368, subd. (a)), and if defense counsel indicates a belief the defendant "is or may be mentally incompetent," the court must order a competency hearing (§ 1368, subd. (b)), and "all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined" (§ 1368, subd. (c)).

Section 1369 sets forth the procedure for determining the mental competence of the defendant. Subdivision (a) of this section requires the trial court to "appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant." The purpose of the appointment is to determine "the nature of the defendant's mental disorder, if any, the defendant's ability or inability to understand the nature of the criminal proceedings or assist counsel in the conduct of a

defense in a rational manner as a result of a mental disorder and, if within the scope of their licenses and appropriate to their opinions, whether or not treatment with antipsychotic medication is medically appropriate for the defendant and whether antipsychotic medication is likely to restore the defendant to mental competence." This subdivision also provides: "In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof. One of the psychiatrists or licensed psychologists may be named by the defense and one may be named by the prosecution." Subdivisions (b) through (f) set forth the procedure for conducting the competency hearing, including the appropriate standard to be employed in reaching the ultimate decision as to competence: "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (§ 1369, subd. (f).)

Finally, section 1370, subdivision (a), provides, "[i]f the defendant is found mentally competent, the criminal process shall resume, the trial on the offense charged shall proceed, and judgment may be pronounced," but "[i]f the defendant is found mentally incompetent, the trial or judgment shall be suspended until the person becomes mentally competent." (§ 1370, subd. (a)(1).)

**B.**

***Additional Background***

On October 28, 2010, prior to trial in both the petty theft and domestic violence cases, defendant's trial counsel William Short informed the trial court he was having difficulty communicating with defendant concerning the case. The trial court asked defendant if that was true. Defendant responded: "No. I told him I didn't want to postpone anything or anything like that. And, you know, he's throwing a fit at me." The trial court then asked defendant whether he wanted to go to trial the following Monday. Defendant responded: "Yes, sir." In response to the trial court's suggestion that they set

8

the trial for Monday, Short stated that in discussing the case with defendant during the previous few weeks, he "frequently" questioned whether defendant was either "not understanding" or "not paying attention." Short then explained he had spoken with defendant's mother, who informed him defendant "always had a problem understanding" and "had some problems when he was in school." Short also explained: "I've toyed with the idea of [declaring a doubt as to defendant's mental competence under section] 1368 because one of the prongs of [section] 1368 is the client has to be willing to understand and assist. [Defendant] feels that he just wants to go forward no matter what. I'm not sure he's even aware that there's a second case on the [petty theft charge], although we discussed it." After explaining the defendant refused to meet with him that afternoon, Short stated: "So I have no alternative at this point but to declare a [doubt as to defendant's mental competence under section] 1368 in both matters. I have to express a doubt that [defendant] does not adequately understand what I'm saying."

Defendant responded: "Your Honor, I know what's going on," and elaborated: "I mean, just because I've been, done a little bit of time doesn't mean -- I'm not stupid. But he's sitting there talking to me, do you know what I mean? I told him, 'No, I want to get on with the trial.' He's throwing a fit at me. I don't want to sit there and talk because he's going to get mad at me because I want to go to trial." At this point, Short interrupted defendant, asked that the prosecutor be removed from the courtroom "so that nothing [defendant said would] hurt his case," and denied "throwing a fit." The trial court responded: "I'm not concerned about that. Right now I'm concerned about whether or not we might have a doctor appointed to examine [defendant] to see if he's competent to stand trial or assist counsel." Short agreed and added: "I'm also asking that we ask a doctor to examine his IQ. I think maybe there's a basic lack of understanding." Implicitly finding there to be a doubt concerning defendant's mental competence, the trial court suspended the criminal proceedings and appointed Paul R. Wuehler, Ph.D., to examine him pursuant to section 1369.

9

On November 19, 2010, Dr. Wuehler visited defendant at the Butte County Jail to conduct the ordered examination. Defendant declined to participate. As Dr. Wuehler noted in a letter to the trial court: "The defendant elected to not talk with the examiner. He did state: 'I know what is going on,' referring [to] the court process. However, he did not make any other comments or responses regarding his present legal process. As the defendant left the interview room, he said to this examiner: 'I don't mean to be disrespectful.'" Based on this conversation, Dr. Wuehler was not able to express an opinion regarding defendant's mental competence.

The competency hearing was held on December 2, 2010. David Nelson, an associate of Short, appeared specially on behalf of defendant. After the trial court stated it had received Dr. Wuehler's letter, Nelson argued that "the Court has to make a determination whether [defendant is] competent to stand trial, not just simply that he knows what is going on, but also whether he can cooperate with the defense attorney. [¶] Those are the issues that the psychiatrist has to examine to determine if that, indeed, is the case. In order to move [the] case along, [defendant] needs to cooperate. He has expressed to me he is not willing to meet with the psychiatrist." The prosecutor then asked whether defendant would be willing to meet with a different doctor. Nelson responded: "I don't believe it's the personality of the doctor with [defendant]. He says he's prepared to go to trial, and there's been an expression by [Short] that he is not competent to stand trial. That needs to be determined whether or not [defendant] should go to trial and if you want to set it for trial, it needs to be determined if he is competent to stand trial. I don't know how we can do this without his cooperation."

The trial court then addressed defendant and explained it needed some information before it could make a determination regarding defendant's competence to stand trial. Defendant raised his hand. When asked if he had something to say, defendant responded: "Where did this all come about anyways? That -- I mean, why do I have psych and everything? Where did it come about? Who determined that? My lawyer?" The trial

10

court answered: "Right." Defendant responded: "I'm capable of understanding what is going on fully." The trial court tried to explain the purpose of the psychological evaluation. Defendant interrupted: "I don't need to see psych. I don't need to talk to him." The trial court then asked defendant whether he wanted another doctor appointed. Defendant responded: "No. I'm fully aware of what's going on." He also stated: "It's actually starting to upset me."

The trial court addressed Nelson: "All right. What I'm going to do, is give you some time to talk with [defendant] this morning and meet with him, explain to him the importance of talking with the psychiatrist, and then come back and report to the Court any further information that you have as to his willingness to proceed with the doctor's evaluation, and I'll take up the issue further after you've had some additional time to talk with him." After conferring with defendant, Nelson reported to the trial court: "He has indicated again he's not going to talk with the doctor, and it doesn't matter which doctor you appoint, your Honor." Nelson also stated: "At sidebar I indicated to the Court my dealings with [defendant] and although limited, he knows who I am. He knows I am defense counsel. He knows who the judge is, who the prosecution is. [¶] I don't know what dealings he had with [Short], but [Short] has expressed doubts under [section] 1368. For the record I would be hard-pressed to express that same doubt myself. He seems to understand his case. He wants to talk with me about his case, to go over discovery with me and to cooperate in his defense. He wants to go to jury trial as soon as possible. [¶] I've indicated to him until we get the [section] 1368 matter resolved, we can't set the matter for trial so he seems to understand the system. He understands what he's here for and he understands what the process is. I will make that representation to the Court." In response to the trial court's question concerning whether defendant understood what a jury trial is, Nelson answered: "He does."

At this point, the prosecutor stated she was willing to proceed to trial if defendant was found to be competent, but expressed concern about the "conflict [between Short and

11

Nelson] as to an expression of doubt as to his competency." The prosecutor also advised the trial court that defendant's "rap sheet" indicated a "sophistication with the criminal justice system." Nelson then stated: "Your Honor, I indicated to [defendant] that I've kind of placed the Court in a dilemma here. [Short]'s expressed a doubt. I don't have the same doubts that [Short] expressed. [¶] And I respect that [the prosecutor has] to protect the record. That's part of [her] job. And I've placed the Court in a rather tenuous position. I don't see that a [competency hearing] is necessary here. I'm making that representation to the Court. [Short] has. [¶] And the Court has sent this out for determination under [section] 1368 and stayed the proceedings, and I've urged [defendant] to cooperate with that determination. I am confident that once he does that, that he'll become competent, and we'll proceed with trial. He refuses to do so, and so that's where we are." The prosecutor then stated her concern that "those of us sitting here do not carry the expertise to make that determination." Nelson responded: "And that's part of [defendant's] problem. He resents having been referred for [an evaluation under section] 1368. We are lawyers; we are not psychiatrists. We are not doctors, but that is part of defense counsel's duties to determine whether or not our client is competent to stand trial. I'm not criticizing [Short] for doing that. I've done it many times myself."

The trial court then asked defendant whether he was willing to cooperate with his attorney, discuss the facts and circumstances of the case, and provide all information needed to present a defense. Defendant answered: "Yes, ma'am." He then expressed a preference to have Nelson represent him, but stated he had not refused to cooperate with Short. The trial court ruled: "The Court has considered the burden of proof and the materials presented to the Court, also considered its interactions with [defendant] in this matter, and based on information provided to the Court today as well as the doctor's letter which reflects a respectful refusal to cooperate, an understanding of the court process, essentially, but just that he doesn't want to participate, the Court finds that the defense

12

has not met its burden to show that the defendant is incompetent to stand trial; therefore, the defendant is deemed competent and criminal proceedings are reinstated."

## C.

### *Analysis*

Defendant first argues that section 1369 "requires examination by two psychiatrists or psychologists if the defendant opposes challenge to his or her competency," and "despite [defendant's] insistence at both the October 28, 2010, and December 2, 2010, hearings that he strongly opposed any suggestion that he was mentally incompetent, the [trial] court appointed only one psychiatrist, instead of the two required by section 1369." We agree the trial court should have appointed two psychiatrists or psychologists, but conclude defendant was not prejudiced by the trial court's failure to do so.

As mentioned, where "the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof." (§ 1369, subd. (a).) The trial court appointed Dr. Wuehler to examine defendant on October 28, 2010, after Short expressed a doubt about defendant's competence to stand trial. The trial court had a duty to appoint an additional expert only if defendant or Short informed it at that time that defendant was not seeking a finding of mental incompetence. Based on the record, we conclude defendant was not seeking a finding of mental incompetence. In response to Short's expression of doubt concerning defendant's competence, defendant stated: "Your Honor, I know what's going on," and explained his position that Short expressed a doubt regarding his competence after "throwing a fit" over the fact that defendant did not want to postpone going to trial. While defendant did not utter the magic words that he was "not seeking a finding of mental incompetence" (§ 1369, subd. (a)), we believe it would exalt form over substance to conclude defendant did not inform the trial court he was not seeking such a finding.

13

However, the purpose for the appointment of two experts in such circumstances is to provide "minimum protection for the defendant against being incorrectly found incompetent to stand trial." (*People v. Harris*, *supra*, 14 Cal.App.4th at p. 996.) Here, defendant declined to cooperate with Dr. Wuehler, stating: "'I know what is going on,' referring [to] the court process." During the subsequent competency hearing, the trial court asked defendant whether he wanted another doctor appointed. Defendant responded: "No. I'm fully aware of what's going on." Nelson then conferred with defendant and confirmed: "He has indicated again he's not going to talk with the doctor, and it doesn't matter which doctor you appoint, your Honor." Nelson also stated on the record that he would be "hard-pressed" to express the same doubt about defendant's mental competence expressed by Short, explaining: "He seems to understand his case. He wants to talk with me about his case, to go over discovery with me and to cooperate in his defense. He wants to go to jury trial as soon as possible." Based on Dr. Wuehler's letter reciting defendant's refusal to cooperate, Nelson's statements concerning his interactions with defendant, the trial court's own observations of defendant, and the presumption of mental competence found in section 1369, subdivision (f), the trial court ruled defendant had not carried his burden of establishing his incompetence to stand trial and reinstated the criminal proceedings. Thus, defendant was not incorrectly found incompetent to stand trial and cannot have been prejudiced by the trial court's failure to appoint two experts.

Defendant disagrees, arguing that "two experts rather than one would have made a substantial difference in convincing [him] to cooperate and generating actual evidence by which the [trial] court could make a knowledgeable decision." This argument is belied by the record. At the competency hearing, the trial court offered to appoint a second doctor if that would convince defendant to cooperate. Nelson conferred with defendant and informed the trial court defendant would refuse to cooperate with any doctor appointed. We have no doubt that had the trial court appointed two doctors to examine

14

defendant, he would have refused to cooperate with both of them. Accordingly, based on the facts of this case, the failure to appoint two experts could not have affected the amount of evidence available to the trial court in determining defendant's competence to stand trial.

Nor did the trial court violate defendant's right to due process by failing to conduct a "meaningful" competency hearing. We find *People v. Maxwell*, *supra*, 115 Cal.App.3d 807 to be instructive. There, like here, defense counsel expressed a doubt about the defendant's competence under section 1368, the defendant objected, and the trial court suspended the criminal proceedings pending a determination of the defendant's competence to stand trial. Unlike the present case, the trial court appointed two psychiatrists to assess the defendant's mental competence. (*Id*. at p. 809.) However, like here, the defendant refused to cooperate. At the competency hearing, the trial court explained that it had received a letter from each psychiatrist indicating defendant's refusal to see them. The trial court then asked defense counsel if he had any reason to dispute the psychiatrists' statements. Defense counsel said that he did not. The trial court then ruled: "'[T]hat being the case, I don't have any reason at this time to doubt [the defendant's] competency to stand trial. The code provides that a defendant is presumed to be competent to stand trial, and I have no evidence to the contrary. I have observed his conduct in court, and while it seems to border on the bizarre, that may very well be calculated activity on the part of the defendant. So, I am going to adjourn the [section] 1368 proceedings at this time and reinstate criminal proceedings.'" (*Id*. at p. 810.)

The Court of Appeal held that this hearing satisfied the requirements of section 1369, explaining: "The burden was on defense counsel to offer any evidence he might have in support of the allegation of mental incompetence. (§ 1369, subd. (b)(1).) Defense counsel not having assumed the burden and the People having elected to offer no evidence, the court was left with two letters from the doctors reciting defendant's refusal

15

to see them, its own observations of defendant since its expression of doubt a month and a half before and the presumption of mental competence which defense counsel had not seen fit to challenge.  [Citation.]  On this state of the record the judge declared that he no longer had a doubt in his mind concerning defendant's competence to stand trial.  The fact that neither party chose to present evidence on the issue does not point to the absence of a hearing.  This very situation is clearly contemplated in section 1369, subdivision (b)(2)."  (*People v. Maxwell*, *supra*, 115 Cal.App.3d at p. 811.)

Similarly, here, neither defense counsel nor the prosecution offered any evidence on the issue of defendant's mental competence.  Nelson had an opportunity to do so.  Instead, he declared that defendant appeared to understand the proceedings against him and appeared to be able to assist in his defense.  Given the absence of any evidence defendant was incompetent to stand trial, the trial court based its ruling of competency on Dr. Wuehler's letter reciting defendant's respectful refusal to cooperate, Nelson's statements concerning his interactions with defendant, the trial court's own observations of defendant, and the presumption of mental competence found in section 1369, subdivision (f).  This complied with section 1369 and did not violate defendant's right to due process.  "The core of due process is the right to notice and a meaningful opportunity to be heard."  (*LaChance v. Erickson* (1998) 522 U.S. 262, 266 [139 L.Ed.2d 695].)  Defendant was afforded both.

## II

### *Instructional Error*

Defendant also claims the trial court prejudicially erred and violated his constitutional right to due process by failing to instruct the jury concerning the effect of voluntary intoxication on his ability to form the mental state required for the criminal threat charge, despite his failure to request such an instruction below.  However, as defendant acknowledges, our Supreme Court has consistently held that "[a]n instruction on the significance of voluntary intoxication is a 'pinpoint' instruction that the trial court

16

is not required to give unless requested by the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 145, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421; *People v. Myles* (2012) 53 Cal.4th 1181, 1217; *People v. Verdugo* (2010) 50 Cal.4th 263, 295; *People v. Saille* (1991) 54 Cal.3d 1103, 1120.)  We must therefore reject defendant's contention.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### III

### *Ineffective Assistance of Counsel*

Anticipating that we would find no sua sponte duty to instruct on voluntary intoxication, defendant complains his trial counsel rendered constitutionally deficient assistance by failing to request such an instruction.  He is mistaken.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  This right "entitles the defendant not to some bare assistance but rather to *effective* assistance.  [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.'  [Citations.]"  (*Ibid*.)

The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant.  (*People v. Camden* (1976) 16 Cal.3d 808, 816.)  "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."'"  (*In re Harris* (1993) 5 Cal.4th 813, 832-833; see also *People v.*

17

*Ledesma, supra*, 43 Cal.3d at pp. 216-217; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

Defendant argues, "there could be no possible reason why [his] counsel would knowingly want the jury to fail to consider the legal implications of [his] drunken state when judging whether he had the requisite intent to commit [the crime of making a criminal threat]." Assuming this to be true, we find no prejudice.

While voluntary intoxication "'is not a defense to a general intent crime,'" evidence of such intoxication "is admissible on the issue of whether or not a defendant actually formed a required specific intent or mental state." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312, quoting *People v. Velez* (1985) 175 Cal.App.3d 785, 791; former § 22, subd. (b).) The crime of making a criminal threat requires a specific intent. The elements of the crime are: "'(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat *with the specific intent that the statement . . . is to be taken as a threat,* even if there is no intent of actually carrying it out," (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 630, italics added.)

Here, there was evidence defendant was intoxicated at the time he violently attacked and threatened Lemilliere. However, we cannot conclude defendant was prejudiced by his trial counsel's failure to request an instruction on voluntary intoxication because it is not reasonably probable the jury would have found this intoxication negated his intent that the statement, "Die, bitch, die" be taken as a threat. Defendant made this

18

statement while holding a pillow over Lemilliere's face. In this situation, it is difficult to fathom what else defendant could have intended to convey. Moreover, the timing of the statement lends support to the conclusion defendant intended for it to be taken as a threat. After punching Lemilliere in the face multiple times and striking her head into the wall, he said: "Oh, my god." Lemilliere responded: "See what you did to me?" Defendant then struck her head against a stereo speaker, grabbed the pillow, "forced it over her face," and said: "Die, bitch, die." Even if the jury were to conclude defendant's intoxication caused him to act from impulse when he started the attack, rather than specifically intending any particular consequences, the jury was likely to conclude from defendant's "Oh, my god" statement that the gravity of his actions was starting to sink in. Rather than stop, defendant struck Lemilliere's head against a speaker and threatened to kill her while smothering her with a pillow. He then stomped on her face and left the room. On these facts, we cannot find a reasonable probability that, had the jury been instructed on voluntary intoxication, it would have found defendant not guilty of the crime of making a criminal threat.

Thus, defendant's claim of ineffective assistance of counsel must fail.

## IV

### *Denial of Defendant's Request for Mistrial*

We also reject defendant's assertion the trial court violated his right to due process by declining to grant a mistrial after the prosecution mistakenly played a portion of a jailhouse phone call the trial court had ordered redacted.

### A.

### *Additional Background*

At trial, Lemilliere testified she did not remember defendant punching her, slamming her head into the wall or speaker, holding a pillow over her face while threatening her, or stomping on her face. According to her testimony, she argued with defendant over her decision to take the grandchildren home. This argument turned into a

19

shoving match, defendant grabbed her by the hair, and the next thing she remembered was running down the stairs after the incident. Lemilliere also testified she had not discussed the case with defendant prior to trial. In order to impeach this testimony, the prosecution sought to introduce a recording of a jailhouse phone call in which defendant told Lemilliere that "[o]nce they get [her] on that stand it's a fuckin' wrap" and she could "plead the 5th." Lemilliere responded that her older brother told her "what to do."

The trial court ruled the recording admissible for impeachment purposes, but ordered it to be redacted to remove the following statement from defendant: "Can you see I am going to be going away for a while? You know that, right?" The trial court explained the statement was "misleading" because "it implie[d] guilt in [the domestic violence] case" even though defendant could have been referring to the fact that he would be "going away" for his conviction in the petty theft case, a matter the trial court was trying to keep from the jury. The trial court also explained it agreed with the prosecution's argument that the statement was an attempt to gain sympathy from Lemilliere in order to influence her testimony, but noted the danger the statement might also engender sympathy from the jury by improperly focusing their attention on "the issue of penalty and punishment."

The recording was played for the jury. Outside the presence of the jury, defense counsel informed the trial court that, while the transcript of the recording was properly redacted, the recording itself contained the objectionable statement. Defense counsel moved for a mistrial. The trial court denied the motion, explaining: "I would take it a lot more seriously if it was evidence that went to the guilt or innocence of the defendant. Your motion is noted for the record. I will deny a mistrial. The record will speak for itself. I don't regard the error as being sufficiently grave as to have deprived the defendant of a fair trial." The trial court further explained: "I am also instructing the jury that they are to consider that whole tape solely for the purpose of impeachment and credibility of the witness Lemilliere, and they are not to consider it for the truth of any of

20

the statements that are in the tape. [¶] I think that cautionary instruction is sufficient to remove any problem. And I don't think it's grounds for a mistrial." The jury was so instructed.

## B.

### *Analysis*

If evidence considered by a jury renders a trial unfair, the trial court must declare a mistrial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) However, "[a] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . ." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) In other words, "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

"It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404.) As our Supreme Court has repeatedly explained: "'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'" (*People v. Smith* (2007) 40 Cal.4th 483, 517, quoting *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) Here, the trial court appropriately instructed the jury that the phone conversation between defendant and Lemilliere was to be "considered only for credibility and impeachment of . . . Lemilliere, not for the truth of any statements in the phone call," i.e., not for the truth of defendant's statement that he would be going away for awhile. "Absent evidence to the contrary, and defendant has provided none, we presume the jury followed this instruction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1214.) The trial court did not abuse its discretion in denying defendant's request for a mistrial.

21

# V

## *Section 654*

Finally, defendant argues the trial court should have stayed execution of the sentences imposed on his convictions for making a criminal threat and assault pursuant to section 654. We are not persuaded.

As relevant, section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

This section has been interpreted to preclude multiple punishment for "a single act or indivisible course of conduct." (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) "'The divisibility of a course of conduct depends upon the intent and objective of the defendant. . . . [I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citations.]" (*People v. Akins* (1997) 56 Cal.App.4th 331, 338-339; *People v. Nubla* (1999) 74 Cal.App.4th 719, 730.) However, as our Supreme Court recently explained, a defendant may not be punished twice for a *single act* simply because he or she harbored multiple criminal objectives. (*People v. Mesa* (2012) 54 Cal.4th 191, 199-200.) Instead, the intent and objective test determines whether a course of conduct is indivisible and must therefore be treated as a single "act" within the meaning of section 654. (*People v. Akins*, *supra*, 56 Cal.App.4th at pp. 338-339.) Whether a defendant harbored multiple criminal objectives is a question of fact, the trial court's determination of which must be upheld on appeal if supported by substantial evidence. (*People v. Nubla*, *supra*, 74 Cal.App.4th 730.)

Defendant argues that "[m]aking criminal threats, assaulting, and inflicting corporal injury" arose out of an indivisible course of conduct because they were "intimately connected temporally and spatially." The Attorney General responds by pointing out that the information charged defendant with inflicting corporal injury based on "a laceration and swelling to the lip and bloody nose." The assault charge was based on defendant's act of "stomping on [Lemilliere's] face leaving a visible shoe impression on the left cheek." The criminal threat charge was based on "striking [Lemilliere] in the head multiple times, [and] smothering [her] with a pillow while stating 'Die Bitch Die.'" According to the Attorney General, defendant "harbored distinct objectives and intents when he both hit [Lemilliere] in the face and threatened to kill [her]." And while acknowledging defendant had the same intent when he hit Lemilliere in the face and when he later stomped on her face, the Attorney General argues he "'had a chance to reflect between offenses,' and 'each offense created a new risk of harm.'"

We note at the outset that "the application of section 654 does not depend on the *allegations* of the charging instrument, but on what was *proven* at trial." (*People v. Assad, supra,* 189 Cal.App.4th at p. 200.) The evidence supports the following sequence of events. Defendant punched Lemilliere in the face multiple times, knocking her to the floor. He then struck her head into the wall two times and said, "Oh, my god," prompting Lemilliere to respond: "See what you did to me?" Defendant then struck her head against a stereo speaker, forced a pillow over her face, and said: "Die, bitch, die." Finally, defendant stomped on her face and left the room. Based on this set of facts, the trial court could have found defendant intended to cause Lemilliere physical pain by punching her in the face and striking her head against the wall. This more than sufficed for a single conviction of infliction of corporal injury on a cohabitant. The trial court also could have concluded from defendant's "Oh, my god" comment, and Lemilliere's response, that there was enough of a break in the violence for defendant to reflect upon and renew his decision to harm Lemilliere. (See *People v. Trotter* (1992) 7 Cal.App.4th

23

363, 366-368 [consecutive sentences for two counts of assault with a firearm affirmed where the defendant fired two shots at a pursuing police officer because "reflection was possible" between trigger pulls].) Defendant then slammed her head into a speaker, threatened to kill her, and stomped on her face. Accordingly, at the very least, defendant could be separately punished for *both* inflicting corporal injury on a cohabitant and *either* making the criminal threat *or* assaulting her by stomping on her face. The question remains, however, whether he could be separately punished for both the criminal threat and the subsequent assault.

As mentioned, if the evidence supports the conclusion that defendant "'entertained multiple criminal objectives which were independent of and not merely incidental to each other,'" then we must affirm the trial court's decision to impose and execute sentence on both convictions. (*People v. Akins*, *supra*, 56 Cal.App.4th at p. 338.) The record supports the conclusion that defendant intended to place Lemilliere in fear for her life when he held the pillow over her face and said: "Die, bitch, die." While making this threat, defendant harbored the simultaneous intent to cause her physical pain. This is apparent from the fact that he slammed her head into a speaker immediately before making the threat and stomped on her face immediately thereafter. Moreover, the objective of causing Lemilliere physical pain was not merely incidental to the objective of causing her to fear for her life because stomping on her face did not facilitate the criminal threat. (Compare *People v. Nubla*, *supra*, 74 Cal.App.4th at pp. 730-731 [assault with a deadly weapon and inflicting corporal injury separately punishable; the acts that caused the corporal injury did not facilitate the assault with the deadly weapon] with *People v. Perry* (2007) 154 Cal.App.4th 1521, 1526-1527 [burglary and robbery not separately punishable; adopting a fighting stance with a weapon while fleeing from the property owner facilitated the objective of taking the property].)

24

We conclude substantial evidence supports the trial court's conclusion that defendant's convictions for inflicting corporal injury on a cohabitant, making a criminal threat, and assault were separately punishable.

## VI

### *Prior Prison Term Enhancements*

We do find an error in the judgment. As mentioned, defendant admitted *one* prior prison term enhancement allegation in CM033637 and admitted *three* such allegations in CM033079. However, the trial court imposed the mandatory one-year sentence for *two* of these enhancements. We directed the parties to address in supplemental letter briefs whether this was error and, if so, what the appropriate remedy would be. Defendant argues the trial court failed to advise him of his *Boykin-Tahl* rights prior to accepting his admissions in CM033079. Thus, argues defendant, we must strike one of the prior prison term enhancements. The Attorney General concedes the trial court did not "go through a complete advisement with respect to the prison priors" in CM033079, but argues, "the totality of the circumstances" reveals defendant's "admissions to three prior prison terms were voluntary and intelligent." And because the trial court failed to impose the mandatory one-year term for each enhancement, the Attorney General urges us to remand the matter to the trial court with directions to "impose the additional one year term for the third admitted prison prior, or to provide a statement of reasons as to why the prior is being struck by the court." We conclude that two prior prison term findings must be reversed because we cannot infer defendant voluntarily and intelligently admitted these enhancement allegations.

### A.

### *Additional Background*

As mentioned, in CM033637, defendant was convicted by jury of one count of petty theft. The initial information, filed August 17, 2010, charged the offense as a felony and alleged defendant had one prior theft-related conviction resulting in

25

incarceration. (See former § 666, Stats. 2000, ch. 135, § 134, p. 1991 [requiring one prior theft-related conviction].) The information also alleged one prior prison term enhancement. (§ 667.5, subd. (b).) On January 24, 2011, the information was amended to allege three prior theft-related convictions in order to satisfy the requirements of section 666, which had been amended in the meantime to require three such convictions. (Stats. 2010, ch. 219, § 15, effective Sept. 9, 2010.) The amended information still alleged one prior prison term enhancement. While the prosecution sought to allege each of the three prior theft-related convictions as prior prison term enhancements, defendant objected to this portion of the amendment and the prosecution agreed to delete the additional prior prison term enhancement allegations from the amended information. With those two enhancement allegations deleted, defense counsel agreed to the amended information and asked that the truth of the prior convictions be determined in a bifurcated proceeding. The trial court allowed the amendment, agreed to the bifurcation, and arraigned defendant on the amended information.

On January 26, 2010, immediately prior to the jury's verdict in CM033637, solely for purposes of making the crime of petty theft a felony, defendant admitted to having three prior theft-related convictions resulting in incarceration. Defendant also admitted one prior prison term enhancement allegation. The plea form signed by defendant recited: "Subject to verdict by jury, which is currently deliberating -— if convicted of petty theft, I admit the following three theft priors but not for [section] 667.5." The plea form then listed the three prior theft-related convictions alleged in the amended information. The plea form also recited: "Two prior thefts in this form will be stricken for purposes of sentencing. This admission is merely to satisfy element of [section] 666." Defendant initialed boxes indicating he understood and gave up the right to be tried by jury, the right to remain silent, and the right to confront and cross-examine adverse witnesses. Prior to taking defendant's admissions, the trial court asked defendant: "With respect to this document, [defendant], have you read, understood, and signed this felony

26

plea form in connection with your admission of those priors?" Defendant answered: "Yes, sir." The trial court then asked: "Have you indicated your willingness to give up constitutional rights that are described by initialing the form in the margins?" Defendant answered: "Yes." After explaining the penal consequences of the admissions, the trial court asked: "Will you be making these admissions freely and voluntarily?" Defendant again answered in the affirmative. Defendant also expressed that he was neither threatened nor promised leniency; nor was he under the influence of any drugs or medications. The trial court then took defendant's admissions and found a factual basis in certified copies of defendant's prison records.

In CM033079, as previously stated, defendant was convicted by a separate jury of one count of inflicting corporal injury on a cohabitant, one count of assault, and one count of making a criminal threat. Both the initial information, filed August 17, 2010, and the amended information, filed January 24, 2011, alleged three prior prison term enhancements. During the trial in this case, on February 1, 2011, the trial court asked whether defendant requested that the truth of these priors be determined in a bifurcated proceeding. Defense counsel answered: "Yes." The prosecution joined in the request. The trial court then asked defense counsel: "Does the defense wish to waive jury, or admit those prior prison terms in this case?" Defense counsel responded: "May I have a moment?" The trial court then asked: "These are the same prior prison terms alleged in the other case?" The prosecutor answered: "That's right." The trial court stated: "I would be satisfied with an admission of those based upon the record in the other case." Defense counsel responded: "Your Honor, we are going to admit the priors for purposes --" At this point, the trial court stated for the record that, in CM033637, "these same prior prison terms were admitted, a plea form submitted in support of the admission, and the court accepted the admission of those prior prison terms, found there was a factual basis therefore, and found that he had waived his rights with a full understanding

27

thereof." The trial court then accepted defendant's admissions to having served three prior prison terms without any further advisements.

## B.

### *Analysis*

A criminal defendant's plea of guilty amounts to a waiver of three constitutional rights: (1) the privilege against self-incrimination; (2) the right to a trial by jury; and (3) the right to confront one's accusers. Accordingly, the trial court must advise a defendant of these rights before taking such a plea. (*Boykin*, *supra*, 395 U.S. at p. 243 [23 L.Ed.2d at p. 279]; *Tahl*, *supra*, 1 Cal.3d at p. 132 ["each of the three rights mentioned -— self-incrimination, confrontation, and jury trial -— must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea"].) For a waiver of these constitutional rights to be valid, it must be knowing, intelligent, and voluntary. (*Boykin*, *supra*, 395 U.S. at p. 243.)

In California, the *Boykin-Tahl* advisements must also be given before the trial court may accept a criminal defendant's admission that he or she has prior felony convictions. (*In re Yurko* (1974) 10 Cal.3d 857, 863.) "As an accused is entitled to a trial on the factual issues raised by a denial of the allegation of prior convictions, an admission of the truth of the allegation necessitates a waiver of the same constitutional rights as in the case of a plea of guilty." (*Ibid*.) The trial court must also advise such a defendant of "the full penal effect of a finding of the truth of an allegation of prior convictions." (*Id*. at p. 865.)

The lack of express advisement, and waiver, of each of the *Boykin-Tahl* rights constitutes reversible error unless "the record affirmatively shows that [the admission] is voluntary and intelligent under the totality of the circumstances." (*People v. Howard* (1992) 1 Cal.4th 1132, 1175.)

In *People v. Mosby* (2004) 33 Cal.4th 353 (*Mosby*), our Supreme Court drew a distinction between "silent-record cases" and cases of "[i]ncomplete advisement of

28

*Boykin-Tahl* rights." (*Id*. at pp. 361-363.) In the former situation, the record reveals "no express advisement and waiver of the *Boykin-Tahl* rights before a defendant's admission of a prior conviction." (*Id*. at p. 361.) In such cases, "we cannot infer that in admitting the prior the defendant has knowingly and intelligently waived [the right to trial to determine the truth of the prior conviction allegation] as well as the associated rights to silence and confrontation of witnesses." (*Id*. at p. 362.)

After citing three cases in which no advisements were given, nor waivers taken, our Supreme Court discussed *People v. Johnson* (1993) 15 Cal.App.4th 169 (*Johnson*) (superseded on another point by statutory amendment as stated in *People v. Howard* (2005) 34 Cal.4th 1129, 1137): "Although the record was not entirely silent in [*Johnson*], it was so nearly silent as to be indistinguishable from the three cases just cited. A jury convicted the defendant of three crimes, but before the jury was excused the trial court took the defendant's admission to having two prior convictions and having served a prior prison term. The court did so without admonishing the defendant of his right to a trial on the priors at which he could confront witnesses and need not testify. [Citation.] The court made a fleeting reference to '"whether or not you want a jury trial,"' and without waiting for a response, the court then immediately asked the defendant, '"[W]ere you convicted?"' The defendant admitted the priors. [Citation.] Under the totality of the circumstances, the Court of Appeal in *Johnson* had 'no doubt' that the defendant 'was in fact aware of his right to a jury trial, his right to confront witnesses, and his right to remain silent, all of which he had just exercised in trial.' [Citation.] Nonetheless, absent *any* advisement of those rights, the Court of Appeal concluded that it was 'impossible to determine' whether the defendant 'not only was aware of these rights, but also was prepared to waive them as a condition to admitting his prior offenses' [citation], thus rendering the defendant's admission of the priors neither intelligent nor voluntary." (*Mosby*, *supra*, 33 Cal.4th at p. 362.)

The situation in *Mosby, supra,* 33 Cal.4th 353, unlike that in *Johnson,* involved an incomplete advisement and waiver of the defendant's *Boykin-Tahl* rights. Immediately after the jury found the defendant guilty of selling cocaine, he was informed that he had a right to a jury trial on the prior conviction allegation, waived that right, and admitted the truth of the allegation. (*Mosby, supra,* at p. 364.) Our Supreme Court explained that in such cases, the reviewing court "must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances." (*Id.* at p. 361.) The Supreme Court agreed with the Court of Appeal's conclusion that "'[i]t would exalt a formula (*Boykin-Tahl*) over the very standard that the formula is supposed to serve (that the plea is intelligent and voluntary) to suggest that a defendant, who has just finished a contested jury trial, is nonetheless unaware that he is surrendering the protections of such a trial' when after being advised of the right to a trial on an alleged prior conviction the defendant waives trial and admits the prior." (*Id.* at p. 364.)

Here, like *Johnson, supra,* 15 Cal.App.4th 169, rather than inform defendant he had the right to have a jury decide the truth of the prior prison term allegations, ask whether he was willing to waive that right, and give defendant a chance to respond, the trial court made a fleeting reference to whether defendant wanted to "waive jury, or admit those prior prison terms," stated it "would be satisfied with an admission of those based upon the record in the other case" (in which defendant admitted *one,* not *three,* prior prison term allegations), and then accepted defendant's admissions without further advisements. As was the case in *Johnson,* we find this situation to be indistinguishable from cases in which the defendant was neither informed of, nor waived, the right to jury trial. Also like *Johnson,* we have no doubt defendant was aware of his right to a jury trial, his right to confront witnesses, and his right to remain silent, all of which he had just exercised in trial, and all of which he waived in CM033637. Nonetheless, absent advisement and waiver of the right to trial on the prior prison term allegations, "we

30

cannot infer that in admitting the [prior prison terms] defendant has knowingly and intelligently waived that right as well as the associated rights to silence and confrontation of witnesses." (*Mosby, supra*, 33 Cal.4th at p. 362.)

We must therefore reverse two of defendant's prior prison term enhancement findings. Retrial of these allegations is permissible. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1421.)

## DISPOSITION

Two of defendant's prior prison term enhancement findings are reversed, his sentence is vacated, and the matter is remanded to the trial court for retrial of these allegations and resentencing. The judgment is otherwise affirmed.


        HOCH       , J.


We concur:


       ROBIE     , Acting P. J.


      MAURO    , J.